Judge Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR-09-0084-MJP |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S |
| | ) | SENTENCING MEMORANDUM |
| v. | ) | RE: CAMIE BYRON |
| | ) | |
| CAMIE BYRON, | ) | |
| | ) | [Hearing Date: December 4, 2009] |
| Defendant. | ) | |
| | ) | |

## I.  INTRODUCTION

Defendant Camie Byron comes before the Court having pled guilty to conspiring to commit bank fraud, mail fraud, and wire fraud in violation of Title 18, United States Code, Section 371.  Defendant Byron's five co-conspirators, Vladislav Baydovskiy, Viktor Kobzar, Alla Sobol, David Sobol and Sandra Thorpe all entered guilty pleas to the same charge.  A seventh defendant, Donata Baydovskiy, entered a guilty plea to making a false statement in a matter occurring before the Department of Housing and Urban Development.  The false statement was made during the course of the charged conspiracy.

The charged conspiracy arose from a scheme to defraud lending institutions into making mortgage secured purchase money and refinance loans.  An additional aspect of the scheme included defrauding otherwise unqualified prospective borrowers to secure purchase money loans based on false and fraudulent representations.  The defendants profited from the scheme by charging excessive fees and diverting some of the fraudulently obtained loan

1  proceeds to themselves.  The scheme succeeded in large part due to the defendants'

2  ownership and operation of both a mortgage loan brokerage business (Kobay and

3  Nationwide) and an escrow operation (Emerald City Escrow).  Defendant Camie Byron's

4  role in the charged scheme included preparing many of the fraudulent documents submitted

5  to lenders to falsely represent a prospective borrower's creditworthiness.  In addition, her

6  participation included preparing and submitting false documentation for purchase money

7  loans used to acquire properties in her own name.

8  ## II.  FACTUAL BACKGROUND

9  The facts and circumstances underlying the offense conduct for which Ms. Byron pled

10  guilty are summarized in the Plea Agreement and Presentence Report. (See Plea Agreement,

11  pp. 6-10; P.S.R. ¶¶ 14-34).  The first section of the agreed statement in the Plea Agreement is

12  repeated below for the court's convenience.

13  Kobay Financial Corporation ("Kobay") was a Washington State corporation

14  established on or about September 15, 2000.  Kobay was engaged in the business of

15  originating mortgage loans, and packaging and submitting loan applications and related

16  documents for funding to lenders.  The Defendant was employed by Kobay as a loan

17  processor.  She facilitated the preparation and submittal of documentation to lenders.

18  Nationwide Home Lending, LLC ("Nationwide") was a Washington State limited

19  liability company established on or about November 8, 2005.  Nationwide was engaged in the

20  business of originating mortgage loans, and packaging and submitting loan applications and

21  related documents for funding to lenders.  The Defendant was employed by Nationwide as a

22  loan processor.  She facilitated the preparation and submittal of documentation to lenders.

23  Emerald City Escrow, LLC ("Emerald City") was a Washington State limited liability

24  company established on or about September 15, 2005.  The Defendant's co-conspirators

25  caused the filing of documents with the Washington Secretary of State's Office establishing

26  Emerald City.  Emerald City was engaged in the business of acting as an intermediary to

27  facilitate the purchase and sale of real property.  Emerald City, through the actions of its

28

Government's Sentencing Memorandum
Byron, Camie
Baydovskiy et al., CR-09-0084-MJP) - 2

1  employees and principals, prepared, obtained and delivered written instruments, money, and

2  other things of value to complete or close real property transactions.

3      Beginning in early 2006, shortly after she began working for Kobay, and continuing

4  until on or about December 31, 2008, in the Western District of Washington and elsewhere,

5  the Defendant and her co-conspirators willfully and knowingly conspired, combined,

6  confederated and agreed among themselves, and with other persons, to defraud financial

7  institutions by, among other things: (a) submitting false and fraudulent mortgage loan

8  applications, title documentation, and related documents to financial institutions, thereby

9  causing lenders to make loans; (b) creating false and fraudulent documents intended to

10 conceal the diversion of loan proceeds to the defendants; and (c) diverting fraud proceeds for

11 their personal use and benefit, and to further the fraud scheme.  Other members of the

12 conspiracy furthered the fraud scheme by locating residential real properties that were

13 available for purchase and recruiting straw buyers or otherwise unqualified buyers to

14 participate in purchasing the properties, and falsely inflating the value of the properties,

15      It was part of the conspiracy that members of the conspiracy located residential

16 properties available for purchase and recruited individuals to act as buyers of the located

17 properties.  These individuals, otherwise known as "straw buyers," would allow their

18 identities and credit to be used by members of the conspiracy to purchase the properties.  In

19 most cases, the straw buyers had no intention of permanently owning or occupying the

20 properties.  In many cases, members of the conspiracy paid straw buyers for participating in

21 purchasing selected properties and told straw buyers that they would pay for expenses

22 associated with ownership, including mortgage payments, property taxes, and utilities during

23 their titular ownership of the property.

24      In addition to using straw buyers, members of the conspiracy recruited individuals

25 who were otherwise unqualified to obtain financing to purchase properties.  These

26 unqualified purchasers were misled by members of the conspiracy who failed to disclose the

27 true financing arrangements underlying the purchase transactions.  These otherwise

28

Government's Sentencing Memorandum
Byron, Camie
Baydovskiy et al., CR-09-0084-MJP - 3

1  unqualified individuals were told they would realize significant profits by purchasing the

2  selected properties and subsequently selling the properties to third parties.

3        The Defendant and her co-conspirators would prepare, or cause others to prepare, a

4  Uniform Residential Loan Application ("Loan Application") to facilitate the scheme to

5  defraud. The Loan Application, commonly referred to as a mortgage loan application, or

6  Form 1003, is a universally used mortgage loan application developed by federal government

7  agencies and utilized by financial institutions and other lenders in the mortgage loan approval

8  process. The Loan Application requires prospective borrowers to submit a complete and

9  accurate financial history, including employment information, monthly income, assets and

10 liabilities, details of the residential real estate transaction, and whether the property will be

11 used as the borrower's primary residence. The Loan Application includes an

12 "Acknowledgment and Agreement" clause, pursuant to which borrowers acknowledge that

13 the information provided is true and correct. The Defendant and her co-conspirators, and

14 others acting on their behalf, caused the Loan Applications for the straw buyers and

15 otherwise unqualified buyers to be prepared based upon fraudulent representations related to

16 gross monthly income, employment status, assets and liabilities, and whether the property

17 would be used as the primary residence. The Defendant and her co-conspirators then

18 submitted, or caused to be submitted, the false and fraudulent Loan Applications, together

19 with the false and fraudulent supporting documentation related to income, assets, liabilities,

20 employment status, and tax information to prospective lenders to secure mortgage backed

21 financing. Some of the lenders were financial institutions as defined in Title 18, United

22 States Code, Section 20.

23       Using escrow services provided by Emerald City Escrow, members of the conspiracy

24 created, and caused others to create, false HUD-1 Settlement Statements. HUD-1 Statements

25 are standard forms used to facilitate the closing of residential real estate purchase and sale

26 transactions. They are used to identify and allocate expenditures and payments associated

27 with the transaction. Lending institutions rely on the accuracy of HUD-1 Statements to

28

Government's Sentencing Memorandum
Byron, Camie
Baydovskiy et al., CR-09-0084-MJP) - 4

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   ensure loan proceeds are applied appropriately to protect the lender's security interest in the

2   purchased property.

3          Members of the conspiracy, and others acting under their direction, prepared and

4   submitted false HUD-1 Statements to lending institutions.  False and fraudulent HUD-1

5   Statements were used to conceal the underlying purchase and sale transaction in which the

6   negotiated sale price was often less than that represented on the falsified Statement.

7   Members of the conspiracy prepared multiple HUD-1 Statements in an effort to conceal from

8   purchasers and lenders the true nature of expenditures and payments associated with the

9   purchase and sale transaction.

10         Members of the conspiracy used false and fraudulent HUD-1 Statements to facilitate

11  the diversion of a significant portion of the loan proceeds from escrow accounts for their

12  personal benefit.  A portion of the diverted loan proceeds were used to make payments on

13  fraudulently obtained loans to delay defaulting on the obligation and facilitate further fraud

14  by using the acquired property for subsequent fraudulent transactions.

### III.   ADVISORY GUIDELINE CALCULATION

16         The parties' plea agreement does not include an agreed advisory guideline calculation.

17  Based on the offense characteristics, the government contends the following calculation is

18  accurate:

19    a.   A base offense level of six (6), pursuant to USSG § 2B1.1.(a)(2)   ........   6

20    b.   An eighteen (18) level increase pursuant to USSG § 2B1.1.(b)(1)(D)
           because a reasonable estimation of the actual losses sustained by
21         the victims of the mortgage fraud scheme was more than
           $2.5 million but not more than $7.0   .......................................   18

22
23    c.   A two (2) level increase pursuant to USSG § 2B1.1.(b)(2)(A) because
           the offense involved 10 or more victims.......................................   2

24    d.   A two (2) level increase pursuant to USSG § 2B1.1 (b)(9) because
           the offense otherwise involved sophisticated means...............................   2

25    e.   Acceptance of Responsibility .................................................   [3]

26         TOTAL ADJUSTED OFFENSE LEVEL   .............................   25

27

28

Government's Sentencing Memorandum
Byron, Camie
Baydovskiy et al., CR-09-0084-MJP) - 5

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   This proposed calculation differs from that offered by the Probation Office.  According to the

2   Probation Office, the two level enhancement pursuant to USSG § 2B1.1.(b)(9) is not

3   applicable because the scheme perpetrated by Defendant Byron and her co-conspirators did

4   not otherwise involve sophisticated means.

5        The resulting advisory guideline range, based on the total adjusted offense level of 25

6   would be 57 to 71 months applying a criminal history category of I.  The Presentence Report

7   notes some prior criminal history, concluding that Ms. Byron should be scored under a

8   criminal history category of II.  Applying category II results in an advisory guideline range of

9   63 to 78 months.  The five year statutory maximum sentence under the charged and agreed

10  violation of 18 U.S.C. § 371 effectively caps the advisory guideline range at 60 months.

11     **A.     A Reasonable Estimate Of The Loss For Guidelines Purposes Is More
              Than $2.5 Million But Not More Than $7.0 Million**

12        The government and counsel for defendants Camie Byron and David Sobol have

13  stipulated that the government can establish an estimated loss amount attributable to the

14  admitted fraud for purposes of calculating the applicable offense level of between $2.5

15  million and $7.0 million.  It is anticipated that counsel for defendant Alla Sobol will join in

16  that stipulation.  The stipulation was sought in the interest of avoiding a potentially

17  protracted evidentiary hearing for the limited purpose of establishing a reasonable estimate of

18  the loss.[1]  Recognizing that the court must make its own loss determination, the government

19  offers the following legal points.

20        Absent the stipulation, the government anticipates that the defendants will each

21  contest the loss amount as preliminarily calculated by the Probation Office and the

22  government.  While the government readily concedes that establishing a precise loss amount

23  may be problematic, such precision is not required.  *See, e.g. United States v. Showalter,* 596

24  F.3d 1150, 1161 (9th Cir. 2009)("a district court has a number of permissible methods for

25

26        [1] The stipulation specifically provides that it shall not apply to the judicial determination of
27  restitution in this case. The parties are free to advocate for any amount of restitution, wholly independent
    of the stipulated loss range.  In addition, evidentiary submittals offered to substantiate the agreed loss
    estimate for guidelines purposes are not to be cited to the court for purposes of challenging any proffered
28  claim for restitution.

Government's Sentencing Memorandum
Byron, Camie
Baydovskiy et al., CR-09-0084-MJP) - 6                    UNITED STATES ATTORNEY
                                                          700 Stewart Street, Suite 5220
                                                          Seattle, Washington 98101-1271
                                                          (206) 553-7970

1  determining monetary loss, and 'need not make its loss calculation with absolute precision.'")

2  citing *United States v. Zolp,* 479 F.3d 715, 719; *United States v. Garro,* 517 F.3d 1163, 1167

3  (9th Cir. 2008)("loss need not be determined with precision, but need only be a reasonable

4  estimate...given the available information); *United States v. Miller*, 188 F.3d 1312, 1317 (per

5  curiam) (11th Cir. 1999) (explaining that courts may reasonably estimate the amount of loss

6  because  "often the amount of loss caused by fraud is difficult to determine accurately.").  As

7  discussed below, the government's proffered loss amount attributable to the charged and

8  admitted scheme is a reasonable estimate supported by reliable and sufficient evidence.

9          **1.**      **The Government's Proposed Methodology Is Consistent With The Guidelines And Ninth Circuit Authority**

10       U.S.S.G. § 2B1.1(b)(1) provides for an increase in the base offense level based on the

11  amount of the loss.  Application Note 3(A) defines loss as "the greater of actual loss or

12  intended loss that resulted from the offense."  "'Actual loss' means the reasonably foreseeable

13  pecuniary harm that resulted from the offense."  Application Note 3(A)(I).  "'Intended loss' . .

14  . means the pecuniary harm that was intended to result from the offense . . . and . . . includes

15  intended pecuniary harm that would have been impossible or unlikely to occur . . . ."

16  Application Note 3(A)(ii).

17       As to determining the loss, "[t]he court need only make a reasonable estimate of the

18  loss." Application Note 3(C).  *See also United States v. Lutz*, 154 F.3d 581, 590 (6th Cir.

19  1998) ("In determining the loss for sentencing purposes, a district court need only make a

20  reasonable estimate of the loss, and this court reviews for clear error and reverses the

21  valuation only if it is outside the realm of permissible computations.") (citation omitted).[2]

22       In the case of collateral pledged or provided by the defendant, a credit must be applied

23  based on the fair market value or disposition amount of the collateral at the time of

24  sentencing. Application Note 3(E)(ii).  Notably, this basis for reducing the amount of the loss

25

26  _____

27      [2] It is important to note that the loss calculations necessary to determine restitution under § 3663, and the loss determination necessary for guidelines purposes under USSG § 2B1.1 are distinct.  The purpose of restitution is restorative, to compensate the victims of the offense conduct for harm caused by

28  the defendants.

Government's Sentencing Memorandum
Byron, Camie
Baydovskiy et al., CR-09-0084-MJP) - 7

1  turns on the defendant's own efforts or own collateral, not the efforts or collateral of a third

2  party.

3        Courts have approved a common methodology for assessing a reasonable estimation

4  of loss in cases with mortgage fraud schemes employing practices similar to those used in

5  this case.  This methodology properly holds the mortgage fraudster responsible for the loan

6  money received as a result of the fraud, but appropriately deducts from the loss amount the

7  fair market value of the collateral, as suggested by Application Note 3(E)(ii) to U.S.S.G.

8  §2B1.1. This is the methodology recommended by the government and employed by the

9  Presentence Report to determine actual loss.

10        Subtracting the value of collateral at the time of sentencing from the mortgage loan

11  proceeds to determine actual loss to lenders was employed the Eighth Circuit in *United States*

12  *v. Parish*, 565 F.3d 528 (8th Cir. 2009) in determining loss for sentencing purposes.

13  According to the court in *Parish*:

14        Pursuant to U.S.S.G. § 2B1.1, the equation used to calculate actual loss to the lenders
        is the amount of the fraudulently obtained mortgage loans minus any payments made
15        on the loan principal and the value of the collateral at the time of sentencing.  *See*
        U.S.S.G. § 2B1.1 app. n. 3 (E)(I) and (E)(ii).  The government submitted evidence to
16        the district court that the defendants fraudulently obtained 195 mortgage loans from
        twenty-four separate lending institutions, resulting in defendants receiving
17        approximately $85 million in loan proceeds.  Therefore, we take the amount of the
        loan proceeds-$85,020,128-and subtract the value of the 195 homes built by PMDC
18        and used as collateral.

19  *Id*. at 535.  The government in *Parish* provided the district court with a comparative analysis

20  of the market value of comparable homes to those built by the defendant.  This value was

21  multiplied by the number of properties for which fraudulent loans had been obtained to

22  determine an approximate value of the collateral at the time of sentencing.

23        The First Circuit recently endorsed this approach of "first determin[ing] the total

24  amount of the loan issued for each of the flipped properties, and subtract[ing] from that

25  number the considerably lower amount the land-flippers paid for the piece of property in

26  question . . . [so that the] latter quantity serve[s] as a proxy for the true amount of the security

27  the lender held on the property."  *United States v. Innarelli*, 524 F.3d 286, 290-91 (1st Cir.

28  2008), *cert. denied*, 129 S.Ct 350 (2008).

Government's Sentencing Memorandum
Byron, Camie
Baydovskiy et al., CR-09-0084-MJP) - 8

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   The Ninth Circuit in *United States v. Allen*, 88 F.3d 765 (1996) presented useful

2   guidance for this court to follow in determining a reasonable estimation of loss.  Citing

3   decisions from other circuits, the court in *Allen* held that "actual loss" must take into account

4   the amount recovered or reasonably anticipated to be recovered from collateral that secured

5   the loan, and loan payments made prior to default.  *Id.* at 770 citing *United States v.*

6   *Rothberg*, 954 F.2d 217, 219 (4th Cir. 1992) *United States v. Baum*, 974 F.2d 496, 499 (4th

7   Cir. 1992); *United States v. Smith*, 951 F.2d at 1167-68.

8   The district court in *Allen* found the minimum loss to be $70,255.75.  Based on the

9   record below, the court determined that this figure was derived from testimony finding the

10  gross loan value totaled $170,412.68; the proceeds realized from repossession and resale of

11  properties equaled $100,156.93; and the loan payments made prior to default totaled

12  $54,989.15.  Finding that the district court properly subtracted the resale proceeds from the

13  gross loan value, the court affirmed the loss determination of $70,255.75.

14  The defendant in *Allen* argued that the district court should also have subtracted the

15  $54,989.15 of loan payments made prior to default when calculating the actual loss, thereby

16  reducing the actual loss to $15,266.60.  Denying this argument, the court noted that the loan

17  payments had been credited by the bank towards interest, not principal.  Citing decisions

18  from other circuits approving of the inclusion of accrued interest as part of the actual loss

19  calculation, the court in *Allen* noted that the district court was not asked to include accrued

20  interest as part of the actual loss calculation.  88 F.3d at 771, citing *United States v. Gilberg*,

21  75 F.3d 15, 19 (1st Cir. 1996)(accrued interest included in the loss calculation under §

22  2F1.1); *United States v. Henderson*, 19 F.3d 917, 928 (5th Cir.)(same), *cert. denied*, 130 L.

23  Ed. 2d 137, 115 S. Ct. 207 (1994); *United States v. Jones*, 933 F.2d 353, 354-55 (6th Cir.

24  1991)(same); *United States v. Allender*, 62 F.3d 909, 917 (7th Cir. 1995)(same), *cert. denied*,

25  133 L. Ed. 2d 732, 116 S. Ct. 781 (1996); *United States v. Lowder*, 5 F.3d 467, 471 (10th Cir.

26  1993)(same); *contra United States v. Hoyle*, 33 F.3d 415, 419 (4th Cir. 1994)(loss calculation

27  under § 2F1.1 should not include accrued interest), *cert. denied*, 130 L. Ed. 2d 892, 115 S.

28  Ct. 949 (1995).  The court found that had the district court included the accrued interest, then

Government's Sentencing Memorandum
Byron, Camie
Baydovskiy et al., CR-09-0084-MJP) - 9

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

interest payments made prior to default would have been taken into account. See U.S.S.G. § 2F1.1 comment. (n.7(b)) ("the loss is the amount of the loan not repaid. . ."); *Rothberg*, 954 F.2d at 219; *Baum*, 974 F.2d at 499; *Smith*, 951 F.2d at 1167-68. The district court in *Allen* used only the loan principal to calculate the "amount of the loan"; it did not consider the accrued interest. Using this approach, payments made towards interest could not be considered as repayments made on the loan. The court affirmed the district court's exclusion of the $ 54,989.15 in interest payments from the loss calculation.

Similarly, the court in *Allen* affirmed the district court's refusal to consider the interest proceeds from the non-defaulting loans. The defendant argued that the court should have considered the interest income from these loans claiming it was inconsistent to aggregate losses from defaulting loans and ignore gains from non-defaulting loans. The court affirmed the district court's rejection of this argument. Finding the calculations consistent, the court noted that the district court did not include as part of the loss the interest income the bank lost as a result of default, and therefore did not set off against the loss the interest income received from non-defaulting loans. Contrary to the defendant's argument, the court found it was the lost interest income associated with the defaulting loans, not the amount of the unpaid principal, that is the counterpart of the interest income derived from the non-defaulting loans. The interest income lost on the defaulting loans was not included. Therefore, interest income from the non-defaulting loans should not have been included either.

Finally, in a determination applicable to this case, the court in *Allen* ruled that the district court also correctly refused to include payments made on current outstanding loans. For these loans, the risk of default on the then current loans was offset by the current and prospective amount of income to be collected. Recognizing the difficulty of accurately estimating the default risk and factoring it into the loss calculation, the court concluded that any prospective income should not be considered. 88 F.3d at 771, citing *Smith*, 951 F.2d at 1169 and *United States v. Hughes*, 775 F. Supp. 348, 351 (E.D. Cal. 1991). Finding that the district court's determination that future losses and profits were too speculative to consider

Government's Sentencing Memorandum
Byron, Camie
Baydovskiy et al., CR-09-0084-MJP) - 10

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    was not clearly erroneous, the court in *Allen* concluded that it was inappropriate to consider

2    the loan payments made on the outstanding current loans. *Id.*

3         In summary, the guideline application notes, as applied by the courts, advocate

4    applying the following methodology to the loss determination in this case:

5    -    Aggregate the gross loan value of all loans procured by the defendants during

6         the pendency of the charged scheme provided the identified loans were

7         obtained using one or more fraudulent representations;

8    -    Deduct the gross loan value of all loans for which the lender or loan servicing

9         company is not currently reporting a loss or the borrower is not in default;

10   -    Deduct the fair market value of the pledged collateral (measured at or about the

11        time of sentencing) from the aggregate value of all fraudulently obtained loans

12        that were either foreclosed or are presently in default status; and

13   -    Do not include as part of the loss the interest income the lender lost as a result

14        of default and do not set off against the loss the interest income received from

15        non-defaulting loans.

16        **2.    There Is Sufficient and Reliable Information To Support A
         Reasonable Loss Estimation Of More Than $2.5 Million But Less
17        Than $7.0 Million**

18        The government offers the attached Declaration of James C. Vach as evidence

19   supportive of a reasonable loss estimation of more than $2.5 million but less than $7.0

20   attributable to the charged and admitted mortgage fraud scheme.  As noted in the

21   Declaration, Mr. Vach is a Consumer Fraud Analyst employed by the United States Postal

22   Inspection Service.  He has actively contributed to the government's investigation and

23   prosecution of this mortgage fraud scheme.  One of the tasks he undertook was to contact all

24   of the lenders identified by the government as extending one of seventy-three (73) loans

25   known to have been obtained using fraudulent representations.  The fraudulently obtained

26   loans were listed in a document entitled "Fraud Book."  The Book, a copy of which is

27   attached to the Declaration as Exhibit A, formed the basis of the charged scheme and was

28   provided in discovery to all the defendants.

Government's Sentencing Memorandum
Byron, Camie
Baydovskiy et al., CR-09-0084-MJP) - 11

UNITED STATES ATTORNEY
700 Stewart Street, Suite S220
Seattle, Washington 98101-1271
(206) 553-7970

Mr. Vach's declaration details his efforts to identify the current lender or loan servicing company for each of the identified loans.  Vach Dec. at ¶ 4.  Each identified lender or servicing company was asked to provide current information regarding the loan status.  For those loans identified as being in default status, the lender or servicing company was asked to provide the current fair market value of the property.  Applying the methodology discussed in the preceding section, Mr. Vach assembled the requested information in a second document entitled "Losses from Lenders."  The loss document, a copy of which is attached to the Declaration as Exhibit B, was provided to all of the defendants.  In addition, all of the defendants were given copies of documentation received from the lenders and servicing companies to substantiate the losses.  The government is unaware of any similar efforts being undertaken by the defendants, either collectively or individually.

As candidly admitted above, the government's proffered loss estimate is not precise.  The guidelines and applicable case law do not, however, require precision.  They merely require a reasonable estimation.

**B.**    **The Scheme To Defraud Was Devised And Implemented Using Sophisticated Means**

The government disagrees with the Probation Office's decision not to apply the two level enhancement authorized by U.S.S.G. §2B1.1(b)(9) for offenses otherwise involving sophisticated means.  Application Note 8(C) to Section 2B1.1 states that "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."

Numerous courts have affirmed the district court's application of this enhancement in the context of similar mortgage fraud schemes.  *United States v. Septon*, 557 F.3d 934, 935-36, 937 (8th Cir. 2009) (defendant directed his employees to submit fraudulent documents to lenders concealing the fact that defendant was providing bridge loans to buyers for their down payments; that defendant used his businesses to act as sham employers for borrowers in order to falsely verify and the nature and sources of income; that loan applications falsely inflated borrowers' assets and income; and contained false tax returns,

Government's Sentencing Memorandum
Byron, Camie
Baydovskiy et al., CR-09-0084-MJP) - 12

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

pay stubs, gift letters, bank statements, and bank notes); *United States v. Dinnall*, 2009 WL 405365 (11th Cir. 2009) (unpublished) (defendant created and submitted to lenders fraudulent employment and earnings statements in eleven loan applications for borrowers, including fraudulent forms to verify employment, W-2 statements, payroll stubs, bank account statements, and other information, and who listed the phone numbers of friends and relatives on the employment records and recruited those individuals to verify the false information); *United States v. Wright*, 496 F.3d 371, 377-78 (5th Cir. 2007) (defendant used his own funds to purchase cashier's checks for closing costs in the names of the loan applicants, made copies of the same checks which were forwarded to the lenders, then deposited the same cashier's checks into his account); *United States v. Small*, 210 Fed. Appx. 776 (10th Cir. 2006) (unpublished) (defendant employed shell corporations, false financial statements and fictitious persons); *United States v. Edelmann*, 458 F.3d 791, 815-16 (8th Cir. 2006) (defendant created numerous false documents, including multiple years of tax returns, supporting documents, such as W-2 and 1099 forms, bank statements, articles of incorporation, profit and loss statements, and bank letters); *United States v. Amico*, 416 F.3d 163, 169 (2nd Cir. 2005) (defendant used false bank documents; the solicitation and creation of false appraisals; the creation of false blueprints; submission of false blueprints to town officials in order to inflate the assessment of home values; collusion with the attorney representing many of the purchasers at closing); *United States v. Moncrief*, 133 Fed. Appx. 924 (5th Cir. 2004)(unpublished), certiorari granted, judgment vacated by *Moncrief v. United States*, 544 U.S. 1029 (2005) (sophisticated means was employed in mortgage fraud scheme).

As outlined above in the excerpted agreed factual statement, Defendant Byron and her co-defendants employed many, if not most, of the means relied upon by courts in the above cited decisions to support application of the sophisticated means enhancement.  Ms. Byron herself created and oversaw the creation of false tax documents, bank statements, verifications of employment (some of which included the creation of fictitious businesses), loan applications, and verifications of assets.  Those false documents were then used by her co-defendants to secure loans.  The fraudulently obtained loans were closed at an escrow

Government's Sentencing Memorandum
Byron, Camie
Baydovskiy et al., CR-09-0084-MJP) - 13

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  company operated by other participants in the scheme.  Operation of the escrow company
2  facilitated control over the closing process, preventing lenders from discovering the fraud.
3  This concealment was essential to the success of the scheme.  It permitted the fraud to
4  continue unabated for over two years.

## IV.   RECOMMENDATION & JUSTIFICATION

### A.       Criminal Fine, Restitution, Supervised Release

7       The government believes that Ms. Byron lacks the necessary resources to pay both a
8  criminal fine and the mandatory restitution obligation to be sought by the government.
9  Consequently, the government will not oppose a request that the fine be waived.

10      The charged conduct to which Ms. Byron pled guilty involved offenses "committed by
11 fraud or deceit," imposing a mandatory restitution obligation.  18 U.S.C. § 3663A(c)(1)(A)(ii).
12 Section 3663A(d) of the Mandatory Victim Restitution Act provides that "[a]n order of
13 restitution under [the Act] shall be issued and enforced in accordance with section 3664.
14 18 U.S.C. § 3663A(d).  Determining the appropriate restitution amount in this case presents
15 some legal and factual issues requiring supplemental briefing and testimony.  This court has
16 scheduled a joint restitution hearing for January 29, 2010.

17      Finally, the government concurs with the Probation Office's recommendation to impose
18 a three year term of supervision.  Three years of oversight is necessary to reduce the likelihood
19 of recidivism.

### B.       Term of Imprisonment

21      In consideration of the factors set forth in 18 U.S.C. § 3553(a), together with an advisory
22 guideline range capped by the statutory maximum of sixty (60) months as advocated by the
23 government, the government recommends that this Court sentence Defendant Byron to
24 thirty-six (36) months of imprisonment.

### 1.       The Nature and Circumstances of the Offense

26      Unfortunately, the mortgage fraud scheme perpetrated by Defendant Byron and her co-
27 conspirators in this case was not unique.  Prosecutors nationwide are investigating and have
28 charged numerous schemes involving the same, or similar, deceptive acts.

Government's Sentencing Memorandum
Byron, Camie
Baydovskiy et al., CR-09-0084-MJP) - 14

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  http://www.fbi.gov/publications/fraud/mortgage_fraud08.htm.  The tremendous scale of the
2  problem has led many to label mortgage fraud as a significant contributor to our nation's
3  financial problems.  Fraud perpetrated by those involved in the mortgage lending industry has
4  caused massive losses to lenders and is responsible for the failure of banks and private lending
5  institutions.  Investors in mortgage backed securities have lost funds needed for income and
6  retirement.  Home values have been distorted by inflated appraisals leading to a shortage of
7  affordable housing.  Foreclosures caused by mortgage fraud have riddled neighborhoods with
8  abandoned houses and properties in disrepair.

9       A consistent sustained increase in home values led to relaxed loan underwriting
10  standards.  Loan applications, appraisals, and real estate closing documents were not closely
11  scrutinized because the residential real estate industry assumed the rising real estate values
12  would insure that lenders would recoup their funds from the sale of the home if they had to
13  foreclose.  In addition, it was assumed that homeowners unable to afford their mortgage
14  payments would simply re-finance based on the ever increasing value of their homes.

15       Several professionals in the residential real estate industry, including Defendant Byron
16  and her co-defendants in this case, seized on opportunities presented by these market
17  conditions.  They took advantage of the decreased scrutiny and a rising market by orchestrating
18  real estate transactions using fraudulently inflated prices, falsified borrower qualification
19  documents, and sham closings to divert loan proceeds to themselves.  Lenders were left with
20  both unqualified borrowers lacking the resources to honor their loan commitment, and
21  overvalued properties to securitize the debt.  The well documented collapse of the residential
22  real estate market exposed the fraud.  Lenders could no longer look solely to the pledged
23  properties to recover their losses.

24       The government anticipates that one or more of the defendants will seek to rely on the
25  decreased scrutiny in the residential real estate lending markets as a mitigating factor for their
26  own conduct.  Any suggestion that this Court should discount a particular defendant's personal
27  responsibility for preparing and submitting fraudulent documents and making false
28  representations in an orchestrated effort to obtain loan proceeds should be summarily denied.

Government's Sentencing Memorandum
Byron, Camie
Baydovskiy et al., CR-09-0084-MJP) - 15

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

There is no basis in the law or equity for the proposition that criminal conduct be excused because the victim failed to take adequate measures to protect themselves or their property. The relaxed underwriting standards employed by lenders prior to collapse of the residential real estate market were neither an invitation to commit fraud nor an excuse for those unscrupulous enough to steal.

The particular scheme charged and admitted to by Ms. Byron, while not unique in its methodology, required the collaborative efforts of mortgage brokers, loan officers, accountants, and escrow closers. Each played a vital role in developing, implementing and perpetuating the scheme. Anyone of the scheme participants could have withdrawn and reported the illegal activity.

## 2.    History and Characteristics of the Defendant

Ms. Byron had no prior experience working in the banking or real estate service industries before being hired by co-defendant Vladislav Baydovskiy for an office support position at Kobay. She worked at Nationwide when Kobay ceased business operations. Her initial conduct was limited to preparing, and causing others to prepare, false documents for submittal to prospective lenders. She subsequently became a more active participant in the scheme by preparing and using false and fraudulent documentation to purchase multiple properties in her name and names of family members and friends.

As noted in the parties' Plea Agreement, Ms. Byron agreed to cooperate fully in the government's investigation of the charged scheme. She has fully honored that commitment by providing several interviews during which she provided information related to the activities of her co-defendants as well as others in the mortgage industry. The government also acknowledges Ms. Byron's decision to provide law enforcement agents with a statement of her knowledge at the time of her arrest.

## 3.    Reflect Seriousness of Offense, Promote Respect for the Law, and Provide Just Punishment

As noted in sub-section 1 above, the mortgage fraud scheme perpetrated by Ms. Byron and her co-conspirators was largely successful due to relaxed oversight by lenders. Lenders

Government's Sentencing Memorandum
Byron, Camie
Baydovskiy et al., CR-09-0084-MJP) - 16

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  relied, to their detriment, on the truthfulness of representations made by Ms. Byron and her co-

2  conspirators regarding a borrower's purported qualifications and the value of the properties to

3  be pledged as security for the fraudulently obtained loans.  Motivated by simple greed and the

4  perceived reduced risk of detection, Ms. Byron and her colleagues were undeterred by ethical

5  constraints to make true and accurate representations regarding property values and a

6  prospective borrower's creditworthiness.

7       The recommended thirty-six (36) month term of imprisonment would go a long way

8  toward signaling to the entire real estate industry the seriousness with which fraudulent

9  practices will be sanctioned.  The standards of honesty and transparency so readily abused and

10  ignored by the defendants in this case would best be served by significant terms of

11  imprisonment.  Judicial recognition that dishonest business practices will not be excused

12  regardless of "market conditions" would be underscored by imposing the requested sentence.

13             **4.    Afford Adequate Deterrence to Criminal Conduct**

14       The government has every reason to believe that this prosecution, together with a

15  custodial sentence of the requested duration, would deter Ms. Byron from engaging in further

16  criminal conduct.  An equally important consideration, however, is the deterrent effect this

17  prosecution and the resulting sentences will have on the broader real estate and mortgage

18  lending industries.  As discussed above, countless others employed in the mortgage lending

19  industry profited from using many of the same fraudulent practices prosecuted in this case.[3]

20       These professionals presumably engaged in a risk analysis, concluding that the threat of

21  detection and accountability was outweighed by the loan proceeds so readily stolen from

22  lenders and unwitting borrowers.  The significant terms of imprisonment sought by the

23  government for all of the defendants in this case would signal to others in the industry an

24

25

26       [3]The Mortgage Asset Research Institute's March 2009 report to the Mortgage Bankers
    Association reports that "fraud incidence is at an all-time high," and "[e]merging fraud trends are
    further draining lender, law enforcement, and consumer resources in the industry's most
27  challenging times." http://www.marisolutions.com/resources-news/press-release-20090316.asp
    There were 63,713 mortgage fraud related suspicious activity reports filed with FinCEN in fiscal
28  year 2008, compared to 17,127 such reports in fiscal year 2004 --an increase of 370%.

Government's Sentencing Memorandum
Byron, Camie
Baydovskiy et al., CR-09-0084-MJP) - 17

increased risk to engaging in similar fraudulent conduct, tipping the balance in favor of honest and transparent business dealings.

### 5.   Avoid Unwarranted Sentence Disparity Among Defendants

Ms. Byron is only one of seven defendants charged with criminal conduct in executing the outlined scheme to defraud.  As noted above, Ms. Byron began her participation in the scheme as an office assistant charged with preparing and obtaining false documentation for submittal to prospective lenders.  She initially took direction from co-defendants Vladislav Baydovskiy, Viktor Kobzar and Alla Sobol, the three principals who owned and operated the mortgage brokerage business.  While these ministerial duties suggest a limited role with a corresponding lower assessment of culpability, Ms. Byron did acquire several properties in her own name and her mother's name using fraudulent documents and false representations to secure the required purchase money loans.  These actions highlight a level of personal involvement and awareness that cannot be ignored.  Her personal use of the fraudulent practices to obtain loans sets her apart from a mere employee acting on the direction of others.

The government has not formulated a sentencing recommendation for defendants Vladislav Baydovskiy and Viktor Kobzar.  It anticipates seeking a term of imprisonment of not less than twice that being sought for Ms. Byron.  This anticipated disparity fairly reflects the roles played, and benefits earned, by each in the scheme.

## V.  CONCLUSION

The mortgage fraud scheme perpetrated by Ms. Byron and her co-defendants took advantage of market conditions that enabled those motivated by dishonest intentions to reap significant benefits with very little risk of detection.  Fueled by greed, without any apparent regard for ethical business dealings, Ms. Byron and her co-defendants were undeterred in their collective pursuit for fraudulent loans.  It was not until the near collapse of the real estate markets and the corresponding tightening of lending standards that the defendants' activities were slowed. The sentences this court will impose on Ms. Byron and her co-defendants provide an opportunity to send the message that mortgage fraud, not unlike any other fraud, will be

Government's Sentencing Memorandum
Byron, Camie
Baydovskiy et al., CR-09-0084-MJP) - 18

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   sanctioned as serious criminal conduct.  The government's recommended sentences accomplish

2   this objective.

3          DATED this 30th day of November, 2009

4                                          Respectfully submitted,

5                                          JENNY A. DURKAN
                                           United States Attorney

6
                                           /s/ James D. Oesterle
7                                          JAMES D. OESTERLE
                                           WSBA # 16399
8                                          Assistant United States Attorney
                                           United States Attorney's Office
9                                          700 Stewart Street, Ste. 5220
                                           Seattle, WA 98101
10                                         Facsimile:  206-553-2502
                                           Phone:  206-553-5040
11                                         E-mail: jim.oesterle@usdoj.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Government's Sentencing Memorandum
Byron, Camie
Baydovskiy et al., CR-09-0084-MJP) - 19

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 30, 2009 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the defendants.

*/s/ Kimberly King*
KIMBERLY KING
Legal Assistant
United States Attorney's Office
700 Stewart Street, Ste. 5220
Seattle, Washington 98101
Phone: (206) 553-5127
Fax:   (206) 553-2502
E-mail: Kimberly.King3@usdoj.gov

Government's Sentencing Memorandum
Byron, Camie
Baydovskiy et al., CR-09-0084-MJP) - 20

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970